Harbinger Capital Partners II, LP v Apollo Global Mgt., LLC (2023 NY Slip Op 50503(U))

[*1]

Harbinger Capital Partners II, LP v Apollo Global Mgt., LLC

2023 NY Slip Op 50503(U)

Decided on May 23, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 23, 2023
Supreme Court, New York County

Harbinger Capital Partners II, LP, HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD., HARBINGER CAPITAL PARTNERS SPECIAL SITUATIONS FUND, L.P., HARBINGER CAPITAL PARTNERS SPECIAL SITUATIONS GP, LLC, HARBINGER CAPITAL PARTNERS OFFSHORE MANAGER, L.L.C., CREDIT DISTRESSED BLUE LINE MASTER FUND, LTD, Plaintiffs,

against
Apollo Global Management, LLC, APOLLO INVESTMENT FUND IV, L.P., APOLLO OVERSEAS PARTNERS IV, L.P., AIF IV/RRRR LLC, AP/RM ACQUISITION LLC, ST/RRRR LLC, ANDREW AFRICK, MARC ROWAN, MICHAEL GROSS, MICHAEL D WEINER, AARON J STONE, JEFFREY A LEDDY, ALEXANDER GOOD, RANDY SEGAL, COLUMBIA CAPITAL LLC, COLUMBIA CAPITAL EQUITY PARTNERS IV (QP), L.P., COLUMBIA CAPITAL EQUITY PARTNERS IV (QPCO) L.P., COLUMBIA CAPITAL EMPLOYEE INVESTORS IV, L.P., CCTV ONE FOUR HOLDINGS, LLC, RAJENDRA SINGH, Defendants.

Index No. 652342/2020

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 99, 121, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 206, 250, 255 were read on this motion to DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 003) 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 174, 175, 176, [*2]177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 207, 208, 209, 210, 211, 212, 213, 214, 215, 251, 256 were read on this motion to DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 004) 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 204, 252, 257 were read on this motion to DISMISS
Motion sequence numbers 002, 003, and 004 are hereby consolidated for disposition.
This is an action, inter alia, to recover damages for fraud. In motion sequence number 002, Apollo Global Management, Inc. f/k/a Apollo Global Management, LLC, Apollo Investment Fund IV, L.P., Apollo Overseas Partners IV, L.P., AIF IV/RRRR LLC, AP/RM Acquisition LLC, ST/RRRR LLC (hereinafter collectively the Apollo Funds), Andrew Africk, Marc Rowan, Michael Gross, Michael D. Weiner, Aaron J. Stone, Jeffrey A. Leddy (hereinafter collectively the Apollo Directors), and Alexander Good and Randy Segal (hereinafter together the Apollo Executives)(hereinafter collectively the Apollo defendants) move, pursuant to CPLR 3211 (a)(1) and (a)(5), to dismiss the complaint insofar as asserted against them.
In motion sequence number 003, the Apollo defendants move in the alternative, pursuant to CPLR 3211 (a)(1), (5), and (7), to dismiss the complaint insofar as asserted against them.
In motion sequence number 004, defendants CCTV One Four Holdings, LLC (CCTV) and Rajendra Singh (hereinafter together the CCTV defendants) move, in effect, pursuant to CPLR 3211 (a)(5), (a)(7) and (a)(8), to dismiss the complaint insofar as asserted against them.

 Background
Unless otherwise indicated, the following facts are taken from plaintiffs' complaint, which for the purposes of these motions must be deemed true and construed in plaintiffs' favor (see Leon v Martinez, 84 NY2d 83, 87 [1994]; Norddeutsche Landesbank Girozentrale v Tilton, 149 AD3d 152, 158 [1st Dept 2017]). 
Plaintiffs Harbinger Capital Fund II, LP, and several affiliated entities (hereinafter collectively plaintiffs) are investment funds founded by non-party Philip Falcone (Falcone), managing partner of the funds. This action arises out of plaintiffs' nearly $2 billion investment in wireless broadband company Sky Terra Communications, Inc. (Sky Terra). Defendants in this action are former shareholders, affiliates, directors, officers, consultants, and/or transaction counterparties of Sky Terra.
In 2000, Sky Terra announced that it would seek authority from the Federal Communications Commission (FCC) to operate a revolutionary satellite and terrestrial wireless-service network (the planned network). Its plan involved repurposing its use of electromagnetic spectrum licensed to it by the FCC, referred to as "L-Band," to incorporate a terrestrial component for use with an existing satellite component, referred to as an Ancillary Terrestrial Component (ATC) network. 
Sky Terra's predecessors in interest, Mobile Satellite Ventures, LLC, Mobile Satellite Ventures, LP, and Mobile Satellite Ventures, GP, Inc. (hereinafter collectively MSV), were formed in June 2001 by Motient Corporation (Motient). Motient was the original owner of the [*3]FCC license to use the L-Band spectrum. MSV obtained the L-Band assets from Motient in 2001.
In mid-2001, Sky Terra, then MSV, conducted extensive testing which revealed that the L-Band spectrum, located adjacent to the band on which Global Positioning System (GPS) devices operate, would cause widespread "overload" interference with those devices, also referred to as "out-of-band reception" (OOBR) interference. Such interference posed a significant technical issue for the planned network, given that many GPS devices are critical to national infrastructure and widely used across the United States for aviation, safety, defense, and research. 
Plaintiffs allege that, as part of this testing, engineer Gary Churan, then MSV's Director of System Analysis, tested the frequency response of several commercially available GPS receivers and found that at least six separate GPS receivers experienced significant OOBR overload interference as a result of an L-Band signal analogous to those that would be transmitted during the operation of the planned network. Churan set forth the results of these tests in an October 10, 2001 internal report entitled "Desensitization Performance of GPS Receivers and MSV System Implications: Summary of MSV Laboratory Test Results" (the Churan Report).
According to plaintiffs, defendants were aware of these test results and of subsequent testing which confirmed that the planned network could not operate without OOBR interference. They nevertheless concealed this problem from plaintiffs and from the FCC in order to obtain regulatory approvals to buy time to unload their investments in Sky Terra.
In 2004, based upon defendants' misrepresentations, Sky Terra obtained permission from the FCC to build out the network. However, in mid to late-2010, the GPS industry publicly disclosed concerns about the planned network causing OOBR interference. Up until that time, the GPS industry only raised concerns about another type of interference known as "out-of-band emissions" (OOBE) interference. OOBE interference occurs when a transmitter working in one band of spectrum transmits outside of its allocated bandwidth into a neighboring band of spectrum, the spillover of which interferes with a party's ability to receive signals over its own allocated spectrum. The GPS industry's concerns about OOBE interference were fully resolved by 2009. But the GPS industry's concerns about OOBR interference, a related but different technical problem, were not publicly raised by the industry until mid to late-2010. 
In the meantime, between 2004 and 2010, plaintiffs purchased Sky Terra's debt and equity from the Apollo Funds, and in March 2010, completed the acquisition of Sky Terra from the Apollo Funds. After acquiring Sky Terra, plaintiffs merged the company with a wholly owned subsidiary created by plaintiffs to become a new successor entity, known as LightSquared, a private, closely held corporation. 
In 2008, plaintiffs also acquired a controlling interest in non-party TVCC, which owned rights to a spectrum adjacent to Sky Terra's L-Band. TVCC was owned by Singh, through CCTV and defendants Columbia Capital LLC, Columbia Capital Equity Partners IV (QP), L.P, Columbia Equity Partners IV (QPCO) L.P., and Columbia Capital Employee Investors IV, L.P. (hereinafter collectively the Columbia defendants). Plaintiffs purchases their interest in TVCC for approximately $150 million, believing its adjacent spectrum could be used as part of the planned network. However, according to plaintiffs, they made these investments in Sky Terra and TVCC without knowing about the OOBR interference problem. Had they known about the undisclosed OOBR issue, they would not have invested in Sky Terra or TVCC. 
On January 26, 2011, the FCC conditioned its approval of the planned network on LightSquared addressing and resolving the GPS industry's OOBR concerns. About a year later, on February 15, 2012, the FCC issued a formal public notice proposing to suspend its conditional approval indefinitely, "due to LightSquared's inability to address satisfactorily the legitimate interference concerns surrounding its planned terrestrial operations" (Public Notice, dated February 15, 2012, FCC Docket No. 11-109).
Once the FCC revoked conditional approval for the planned network, LightSquared was unable to renew financing, lost contracting partners, and was eventually rendered unable to continue operations. Consequently, on May 14, 2012, LightSquared, and certain of its subsidiaries, filed voluntary petitions for Chapter 11 bankruptcy (In re LightSquared Inc., Chapter 11, Case No. 12-12080 [SCC] [SD NY]).
Thereafter, on November 1, 2013, LightSquared brought an action in the United States District Court for the Southern District of New York against, inter alia, several GPS device manufacturers and sellers (Lightsquared Inc. v Deere & Co., Case No. 13 Civ 8157 [RMB][SDNY]) (hereinafter the Federal GPS Action). According to the complaint in the Federal GPS Action, the GPS manufacturers and sellers had been aware, since at least 2003, that the planned network would cause OOBR interference with GPS devices, but nevertheless failed to disclose the problem and misled LightSquared into believing that its planned network could coexist with their products.[FN1]

On February 15, 2015, the United States District Court, inter alia, denied a motion by the GPS manufacturers and sellers insofar as it sought dismissal of LightSquared's negligent misrepresentation and constructive fraud claims against them (see LightSquared, Inc. v Deere & Co., 2015 US Dist LEXIS 14412, 2015 WL 585655 [SDNY 2015], affd on other grounds sub nom Harbinger Cap. Partners LLC v Deere & Co., 632 F Appx 653 [2d Cir 2015]). LightSquared thereafter settled the Federal GPS Action, agreeing to pay the GPS manufacturers and sellers tens of millions of dollars in attorneys' fees, in exchange for a promise that they would only lodge limited objections to LightSquared's pending FCC application for approval of a much less valuable version of the planned network. 
Plaintiffs in the instant action were allegedly surprised that LightSquared paid millions of dollars to settle what LightSquared represented to be viable claims against the GPS industry — particularly as to those claims that had already survived a motion to dismiss. According to plaintiffs, it was this "extraordinary" decision to settle the Federal GPS Action on such unfavorable terms that alerted them to the need to perform an investigation. Plaintiffs maintain that in early 2016, during that investigation, they first discovered that the Apollo Funds and the Apollo Directors had known about the OOBR interference problem since as early as 2001.
 The Instant Action
On December 21, 2017, plaintiffs commenced an action in this court against the Apollo Funds and the Apollo Directors alleging that they had perpetrated a massive fraud against plaintiffs in order to induce them to invest nearly $2 billion in Sky Terra when they knew, but concealed, that Sky Terra's planned network had technical problems which prevented it from being built and operated as planned (Harbinger Capital Partners II, LP v Apollo Global Management LLC, Sup Ct., NY County, Index No. 657515/2017). On June 14, 2019, that action was discontinued without prejudice pursuant to a stipulation of the parties (see NYSCEF Doc. Nos. 49-51 [Index No. 657515/2017]). 
On June 8, 2020, plaintiffs filed the complaint in the instant action against all the Apollo defendants (including the Apollo Executives), the CCTV defendants, and the Columbia defendants, alleging, inter alia, that defendants fraudulently induced plaintiffs to invest in Sky Terra and TVCC, knowing that the planned network was not viable because of OOBR interference issues. Plaintiffs allege that, absent defendants' misconduct, they would not have invested in either entity. 
The complaint asserts ten causes of action. In the first, second, and fifth causes of action, respectively, plaintiffs assert claims for fraud, civil conspiracy to commit fraud, and negligent misrepresentation against the Apollo defendants in connection with plaintiffs' acquisition of Sky Terra from the Apollo Funds. In the third and fourth causes of action, respectively, plaintiffs assert claims for fraud and civil conspiracy to commit fraud against the CCTV defendants, the Columbia defendants and Good in connection with plaintiffs' investment in TVCC. In the sixth, eighth, and ninth causes of action, respectively, plaintiffs assert claims for breach of fiduciary duty, breach of contract, and unjust enrichment against the Apollo Funds in connection with plaintiffs' acquisition of Sky Terra from the Apollo Funds. In the seventh cause of action, plaintiffs assert a claim for aiding and abetting breach of fiduciary duty against the Apollo Directors. Finally, in the tenth cause of action, plaintiffs assert a claim for unjust enrichment against the CCTV defendants and the Columbia defendants, asserting that they were unjustly enriched by plaintiffs' purchase of CCTV's interests in TVCC.
On October 28, 2020, plaintiffs discontinued the action insofar as asserted against the Columbia defendants (NYSCEF Doc. No. 17). The Apollo defendants and the CCTV defendants now move, pursuant to CPLR 3211, to dismiss the complaint insofar as asserted against them (motion seq. nos. 002-004). 

Discussion
The Apollo Defendants' Motion to Dismiss the Complaint Pursuant to CPLR 3211 (a) (1) and (5)
In motion sequence number 002, the Apollo defendants move to dismiss the complaint insofar as asserted against them as time barred. "On a motion to dismiss a cause of action pursuant to CPLR 3211 (a)(5) as barred by the applicable statute of limitations, a defendant must establish, prima facie, that the time within which to sue has expired. Once that showing has been made, the burden shifts to the plaintiff to raise a question of fact as to whether the statute of limitations has been tolled, an exception to the limitations period is applicable, or the plaintiff actually commenced the action within the applicable limitations period" (Flintlock Constr. Servs., LLC v Rubin, Fiorella & Friedman, LLP, 188 AD3d 530, 531 [1st Dept 2020] [internal quotation marks and citation omitted]).
First Cause of Action — Fraud
Under CPLR 213(8), a cause of action for fraud must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud or could with reasonable diligence have discovered it" (CPLR 213 [8]; see also CPLR 203 [g][1]). "On a motion to dismiss a fraud claim based on the two-year discovery rule, a defendant must make a prima facie case that a plaintiff was on inquiry notice of its fraud claims more than two years before it commenced the action" (Epiphany Community Nursery Sch. v Levey, 171 AD3d 1, 7 [1st Dept 2019]). "The burden then shifts to the plaintiff to establish that even if it had exercised reasonable diligence, it could not have discovered the basis for its claims before that date" (id.). 
Here, it is undisputed that the alleged fraudulent conduct occurred between 2004 and 2010 when plaintiffs acquired the Apollo Funds' interest in Sky Terra. Plaintiffs commenced this action more than six years after the cause of action for fraud accrued. As such, to be timely, the action must have been brought within two years from the time plaintiffs discovered the alleged fraud, or from when they could have discovered it in the exercise of reasonable diligence. 
"The test as to when fraud should with reasonable diligence have been discovered is an objective one. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him" (Gutkin v Siegal, 85 AD3d 687, 688 [1st Dept 2011][internal quotation marks and citations omitted][emphasis added]; see Boesky v Levine, 193 AD3d 403, 405 [1st Dept 2021]).
On this motion, it is initially noted that the complaint itself acknowledges that plaintiffs were aware of the existence of the OOBR interference issue by mid to late 2010, when the GPS industry made the concern public. Further, by February 15, 2012, at the latest, plaintiffs were aware that the issue would render them unable to implement the planned network inasmuch as the FCC issued a formal public notice indicating that it would suspend the approval of the network indefinitely due to Sky Terra's inability to address such concerns. While "losses that a plaintiff sustains may put it on notice of possible fraud" (Aozora Bank, Ltd. v Deutsche Bank Sec. Inc., 137 AD3d 685, 689 [1st Dept 2016]; see Way Family Trust v Sagepoint Fin., Inc., 188 AD3d 475, 476 [1st Dept 2020]), such knowledge alone does not "automatically" trigger the duty to inquire (CSAM Capital, Inc. v Lauder, 67 AD3d 149, 155 [1st Dept 2009]). However, this knowledge, in combination with other evidence submitted by the Apollo defendants establishes that plaintiffs were on inquiry notice by late 2011.
In this regard, the Apollo defendants submit email correspondence between plaintiffs' managing director, Phillip Falcone, and Sky Terra's former CEO, defendant Alex Good, dated from May 2011 to November 2011 (Email Exchange, NYSCEF Doc. No. 73). In these emails, Falcone questions Good on May 6, 2011 about what testing Sky Terra conducted four or five years earlier and asks:
"what did it look like and did it present an inference issue with GPS?"
(NYSCEF Doc. No. 73). 
Falcone questions Good again on May 21, 2011, asking:
"do you recall what the tests looked like when you guys conducted them? Was there interference?" (id.). On June 19, 2011, Falcone wrote another email to Good asking:
"legal is asking me about gps testing when you were involved and what you disclosed about it prior to closing. Did we ever discuss, I can't recall" (id.). On July 6, 2011, Falcone wrote an email to Good stating:
"A few former msv execs are starting to point the finger are [sic] you and scott for forcing the company to keep the gps thing quiet during the last 5 years while raising money. Just a heads up to what we are hearing" (id.).
Along these same lines, Falcone wrote an email to Good on October 6, 2011, stating:
"Everyone says I should sue you for fraud . . . . do I listen to them? I'm trying to find something where the gps issue was disclosed as I'm giving you the benefit of the doubt but there are some nasty bondholders out there, I hope this works" (id.).
On October 12, 2011, Good responded to Falcone stating:
"I do not know who is proposing you sue me for fraud, but I obviously know the background facts and have perspectives on the issue. Please let me know some times where we might speak" (id.). 
On October 21, 2011 Falcone wrote to Good, stating:
"Alex, no one brought up GPS to me. However, I was with a hedge fund manager last night that scott warned him about gps about the time of our deal. Hence, he backed away" (id.). Falcone wrote to Good again on October 27, 2011, stating:
"What is real disturbing is that no one from sky ever brought up gps during any discussion" (id.). Later that day, Good responded:
"Given several recent e-mails you have sent, I have tried to reach out to you to discuss the issues. I have asked Stella several times about setting up a call but have not heard back from her. I presume therefore you would prefer not to have a call. However, please know I remain willing to get on the phone to discuss the issues you have mentioned including the nature of the process behind the Company's interference disclosures" (id.). On November 4, 2011, Falcone wrote to Good:
"Don't shoot the messenger but what is coming back from lawyers diligence is that when you and scott tried to sell to metro you wanted to keep out the gps language and they refused" (id.). Good responded on November 8, 2011 as follows:
"I promise I will not shoot the messenger but I would like to put an end to these misleading e-mails. To that end, I was disappointed that I did not receive a call from you a week ago Friday where we would have had a discussion of the issues. I called again this morning but Stella said you were unavailable. So I left a massage [sic] for you to call.
Until we speak let me reiterate, I strongly disagree with what I believe are the false implications of your recent notes. As Harbinger was well aware, interference — whether [*4]it was related to ports and waterways, GPS, Mexico, Immarsat, radio astronomy or other— was always an issue with the L Band spectrum. One of the main reasons that you were able to buy this spectrum at a fraction of the cost of other mobile spectrum was the potential for interference restrictions and the regulatory treatment for this spectrum. To that end, public disclosures about the risks associated with interference were made. Furthermore, in addition to these disclosures, appropriate disclosures were made by the Skyterra team directly to the Harbinger team. Your e-mails also surprise me in that you certainly must know, key Harbinger team members and advisors were directly involved in handling or consulting with Skyterra/MSV on key interference issues (including but not limited to GPS), and hence knew of these issues, for years prior to your take private transaction [sic].
Given all of this, I do not understand the recent statements about not knowing about interference issues. Could you please tell me what if any of the foregoing you disagree with so I can try to understand where you are coming from with these recent e-mails?" (id. [emphasis added]). On November 9, 2011, Falcone responded:
"Never heard you nor jerry ever mention gps. On top of it, in the 10 k you said it wasn't material and it wouldn't affect your business plan. Guys close to you are saying that you purposely squashed the results and stuffed them in the drawer. Again, I'm not the one generating this . . . It's all coming from d.c. But it's not pretty how they are drilling you unfortunately.
We really need to have a discussion because I don't like how this is all playing out and how these guys are all trying to throw you under the bus" (id. [emphasis added]). On November 11, 2011, Good wrote to Falcone stating:
"I agree we need to talk so I called again yesterday. I was told you were not available but I left yet another message for you to call. Given your apparent schedule, I would strongly suggest that we have Stella arrange a time for us to speak so we can move to have a dialogue on these issues.
In the interim and having not heard back from you today, I must again disagree with a number of your assertions and the alleged comments of unidentified individuals you mentioned in your most recent e-mail. First, and with all due respect, the recent assertions that somehow you and your team did not know about the GPS issue are simply not credible. In fact, there was a mountain of information on interference in: 1) our FCC filings and the filings of the GPS community, 2) the actual FCC ruling on our application, 3) our public disclosures and the disclosures and of various GPS companies, and 4) our due diligence materials that was discussed with your team pre-close (that included, among other things our estimate of $150mm to address GPS interference issues with network timing devices). In addition, your team had actual knowledge of this issue since several of your advisors were directly involved pre-close in managing the GPS issue with the GPS Council and/or the FCC. I cannot help but add that your current team has been making public statements to the effect that this issue has been know about and negotiated for 'almost a decade.' They are of course correct.
Second, and candidly more offensive to me personally, are the spurious allegations that I was 'stuffing findings in the drawer.' This is demonstrably wrong. Let me give you one example: While we were under no obligation to do so, my network team did some limited GPS testing. When the results were in and at the recommendation of my technical team, I directed that any potential terrestrial rollout would need to include up to $150 mm to address expected GPS interference with mobile timing devices. These numbers were not only not hidden, I am informed that they were in fact discussed with your technical teams pre-close. That is not my idea of 'stuffing findings in the drawer'. Phil these are incontrovertible facts. Given the seriousness of the accusations, I would ask you to please let me know any individual(s) who says I 'stuffed findings in a drawer'. These statements are not only dead wrong, they are at a minimum malicious and may even be actionable" (id. [emphasis added]). On November 16, 2011, Falcone wrote to Good:
"I hear you but I'm not the one who was at the company doing the talking. Talk to your old buddies who are telling everyone that you made them keep the gps issue out of all the presentations when you guys were out shopping" (id.).
The email correspondence establishes that the circumstances were such as to impose a duty of inquiry more than two years before plaintiffs commenced this action. Good insists in one of his emails that "appropriate disclosures were made by the Skyterra team directly to the Harbinger team" prior to plaintiffs' acquisition of Sky Terra. Knowing that such disclosures were not, in fact, made, would have prompted a reasonable investor who had lost almost $2 billion, to investigate further (see Gutkin v Siegal, 85 AD3d 687, 688 [1st Dept 2011]; Lucas-Plaza Hous. Dev. Corp. v Corey, 23 AD3d 217, 218 [1st Dept 2005]). Since plaintiffs fail to allege any facts demonstrating that they thereafter engaged in the exercise of reasonable diligence, the emails conclusively establish a defense to plaintiffs' fraud claims against the Apollo defendants as a matter of law (see Leon v Martinez, 84 NY2d 83, 88 [1994]; Kany v Kany, 148 AD3d 584, 584 [1st Dept 2017]). 
Contrary to plaintiffs' contention, the emails may be considered documentary evidence for the purpose of this motion. "[T]here is no blanket rule by which email is to be excluded from consideration as documentary evidence under [CPLR 3211 (a)(1)]" (Kolchins v Evolution Mkts., Inc., 128 AD3d 47, 59 [1st Dept 2015], affd 31 NY3d 100 [2018]; see Odonata Ltd. v Baja 137 LLC, 206 AD3d 567, 568 [1st Dept 2022]). "In our electronic age, emails can qualify as documentary evidence if they meet the 'essentially undeniable' test" (Amsterdam Hospitality Group, LLC v Marshall-Alan Assoc., Inc., 120 AD3d 431, 433 [1st Dept 2014]). The emails here pass the test inasmuch as they flatly refute plaintiffs' allegation that they had no reason to believe they were defrauded by the Apollo defendants with regard to the OOBR interference issue until late 2015. The emails render it "essentially undeniable" that by 2011, circumstances were such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, prompting a duty of inquiry (see Kany v Kany, 148 AD3d at 584). 
In opposition to the motion, plaintiffs submit Falcone's affidavit, wherein he does not dispute the authenticity of the emails (NYSCEF Doc. No. 136). He explains that his intended purpose in writing them was to obtain information from Good about whether Sky Terra's management was aware of the OOBR interference issue prior to the GPS industry's public [*5]disclosure of the problem in late 2010. Falcone further explains that, contrary to the impression he tried to create in these emails, no one ever told him that Good was aware of or concealed the OOBR inference issue. Falcone states in this regard:
"My purported statements are best understood in the context of the sudden disclosure by the GPS industry of the [OOBR] GPS Defect, which . . . seemed to be fatal to [plaintiffs'] nearly $2 billion investment. I was desperate to find out what had happened and hoped that Mr. Good would, if pressed, tell me. I therefore apparently referenced conversations with third-parties that had not actually occurred in an effort to 'smoke out' what Mr. Good knew. For example, while I stated that there are 'a few former msv execs are starting to point the finger [at] you and scott,' I did not actually know any former msv execs" (id. at & 11). Plaintiffs argue that, in light of Falcone's explanation, the emails cannot serve to establish that Falcone actually possessed the information he was referring to in his emails. Plaintiffs are correct in this regard. However, even accepting that Falcone had no third-party information regarding a possible fraud and that his intent in writing the emails was to "smoke out" what Good knew, Good's response  i.e., we disclosed all of the information to you prior to your acquisition of Sky Terra  should have prompted a further investigation (see Cusimano v Schnurr, 137 AD3d 527, 532 [1st Dept 2016]).
Plaintiffs contend that, rather than serving as a catalyst for further investigation, the emails actually reassured them that no fraud had taken place. In this regard they point out that Good denied "stuffing findings in a drawer" and indicated that he perceived such accusations as "offensive." Plaintiffs assert that Good was also "gaslighting" Falcone by referring to tests MSV conducted regarding OOBE interference, all the while concealing that Sky Terra conducted tests in 2001 that revealed the OOBR interference problem. 
In connection with this argument plaintiffs submit the affidavit of Henry Goldberg, an attorney who performed regulatory due diligence for plaintiffs in making their investment in Sky Terra, negotiated their agreement with the FCC regarding the buildout of the planned network, and dealt with LightSquared's licensing issues with the FCC (NYSCEF Doc. No. 153). Goldberg, who specializes in communications satellite matters and radio spectrum allocations and uses, opines that Good's emails are "highly misleading and appear to conceal further that MSV/SkyTerra was aware of the [OOBR] GPS Defect since at least as early as 2001" (id. at & 22). Goldberg asserts that, instead of discussing the 2001 test results, Good discloses only that the MSV/Sky Terra team was aware of the distinct and irrelevant issue of OOBE interference, thereby misleading Falcone. In addition, Goldberg asserts that Good's reassurances that no fraud occurred, including his assurance that testing was discussed with plaintiffs' technical team "pre-close," are also misleading inasmuch as Good is again not referring to the OOBR issue. Rather, he is referring to mobile timing device issues which were widely known and of limited consequence.
Plaintiffs' argument that Good's emails served to placate Falcone's concerns is unavailing. As already noted, Good did not deny that Sky Terra knew about GPS interference issues prior to plaintiffs' acquisition of Sky Terra. Assuming Good was only referring to the OOBE issue, that issue was fully resolved by 2009 (see Plaintiffs' Complaint in Federal GPS Action, NYSCEF Doc. No. 62 & 91). Therefore, it was no longer of any concern or consequence in 2011 and was not a threat to the viability of the planned network. The critical issue threatening the viability of [*6]the planned network and the value of plaintiffs' investment at the time these emails were written in 2011 was OOBR interference. As such, it is beyond dispute that Falcone's questioning of Good and the implication that Good defrauded Falcone pertained to this issue. Good's apparent failure to address OOBR interference should have prompted Falcone to inquire further and specifically ask Good about that issue. To the extent Falcone found the emails confusing, he had a duty to seek further clarification and/or obtain more information. 
As such, plaintiffs were on inquiry notice of their fraud claims more than two years before the commencement of such claims against the Apollo defendants. Since they "failed to conduct an inquiry at that time, knowledge of the fraud is imputed" (CIFG Assur. N. Am., Inc. v Credit Suisse Sec. (USA) LLC, 128 AD3d 607, 608 [1st Dept 2015]; see Aozora Bank, Ltd. v Deutsche Bank Sec. Inc., 137 AD3d at 690). 
Plaintiffs ultimately conducted an inquiry in 2016 which uncovered the existence of the Churan Report. In 2018, after examining LightSquared's books and records, they purportedly also discovered evidence that Good and Segal were aware of the GPS defect prior to plaintiffs' acquisition of the company. However, the same investigation could have been performed in 2011 (MBI Intl. Holdings Inc. v Barclays Bank PLC, 151 AD3d 108, 116 [1st Dept 2017]["Because (the duty to inquire) was triggered by at least 2008, and plaintiffs failed to pursue any investigation until 2013, five years later, plaintiffs are barred from asserting a claim for fraud"]). Moreover, the Churan Report had been publicly available since 2007, as MSV attached it to a publicly available United States patent application. More importantly, by 2010, plaintiffs had acquired 100% ownership of Sky Terra. As such, they had the right to review all of Sky Terra's internal documents, including its patent files and testing results, as well as to interview all Sky Terra employees, including Churan. Therefore, plaintiffs could have, with reasonable diligence, discovered the alleged fraud by all the Apollo defendants well before the beginning of the controlling two-year period. 
To the extent plaintiffs may be understood as arguing that the doctrine of equitable estoppel tolled the statute of limitations, the doctrine does not apply because plaintiffs failed to "establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit" (see Zumpano v Quinn, 6 NY3d 666, 674 [2006]). The court reiterates that, since as early as 2010, plaintiffs had the right to review all of Sky Terra's internal documents, including its patent files and test results. To the extent plaintiffs may be arguing that the 2011 email correspondence referred to above kept them from bringing suit, that contention is without merit. In the emails Good took the stance that plaintiffs were made aware of all key GPS interference issues prior to acquiring Sky Terra. This could not have kept plaintiffs from bringing suit because they, themselves, knew whether or not they were made aware of the relevant issues prior to acquiring Sky Terra. 
Thus, plaintiffs' first cause of action, alleging fraud against the Apollo defendants is dismissed as time barred.
Second Cause of Action Civil Conspiracy to Commit Fraud
Given that plaintiffs' fraud claim is time-barred insofar as asserted against the Apollo defendants, their claim for conspiracy to commit fraud, which is not an independent cause of action in New York, is not viable (see Boesky v Levine, 193 AD3d at 406; EVEMeta, LLC v Siemens Convergence Creators Corp., 173 AD3d 551, 553 [1st Dept 2019]).
Thus, plaintiffs' second cause of action is dismissed.
Fifth Cause of Action - Negligent Misrepresentation
Plaintiffs' negligent misrepresentation claim against the Apollo defendants, which is based upon the same fraud is subject to the six-year statute of limitations in CPLR 213 (8) (see 14 Bruckner LLC v 14 Bruckner Blvd. Realty Corp., 78 AD3d 431, 431-432 [1st Dept 2010]). "A cause of action based on negligent misrepresentation accrues on the date of the alleged misrepresentation which is relied upon by the plaintiff" (Fandy Corp. v Lung-Fong Chen, 262 AD2d 352, 353 [2d Dept 1999]). It is undisputed that, here, the misrepresentations on which plaintiffs relied occurred between 2004 and 2010, and for the reasons already discussed, plaintiffs waited more than two years after they were on inquiry notice to bring their negligent misrepresentation cause of action. 
Thus, the fifth cause of action against the Apollo defendants is dismissed. 
Sixth and Seventh Causes of Action — Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty
Where, as here, "an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213 (8)" (IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 139 [2009]). "The discovery accrual rule . . . applies to fraud-based breach of fiduciary duty claims" (Kaufman v Cohen, 307 AD2d 113, 122 [1stDept 2003]). The six-year limitations period also applies to the aiding and abetting breach of fiduciary duty claim, since the claim is based on allegations of actual fraud (D. Penguin Bros. Ltd. v National Black United Fund, Inc., 137 AD3d 460, 461 [1st Dept 2016]). 
For the reasons already discussed, these claims are untimely. Thus, plaintiffs' sixth cause of action for breach of fiduciary duty and the seventh cause of action for aiding and abetting breach of fiduciary duty are dismissed.
Eighth Cause of Action - Breach of Contract
The statute of limitations for a breach of contract claim is six years (CPLR 213 [2]). The claim accrues when the contract is breached (Deutsche Bank Natl. Tr. Co. Tr. for Harborview Mtge. Loan Tr. v Flagstar Capital Markets Corp., 32 NY3d 139, 145 [2018]). "New York does not apply the discovery rule to statutes of limitations in contract actions" (ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581, 594 [2015]; Deutsche Bank Natl. Tr. Co. Tr. for Harborview Mtge. Loan Tr. v Flagstar Capital Markets Corp., 32 NY3d at 146). This claim is time-barred because plaintiffs' breach of contract claim arises from an alleged breach of a Securities Purchase Agreement (NYSCEF Doc. No. 51) that occurred in 2008, more than six years before plaintiffs brought their breach of contract claim. 
Thus, plaintiffs' eighth cause of action for breach of contract is dismissed.
Ninth Cause of Action - Unjust Enrichment
Plaintiffs' unjust enrichment claim is subject to the six-year statute of limitations because it is based on allegations of actual fraud (see Sabourin v Chodos, 194 AD3d 660, 662 [1st Dept 2021]; CPLR 213 [8]). The claim "accrues upon the occurrence of the alleged wrongful act [*7]giving rise to restitution" (Kaufman v Cohen, 307 AD2d at 127; Swain v Brown, 135 AD3d 629, 632 [1st Dept 2016]). Here, the alleged wrongful act was the Apollo defendants' failure to disclose the OOBR interference issue prior plaintiffs' purchase of the Apollo Funds' shares in Sky Terra, which occurred between 2004 and 2010. Plaintiffs did not commence this action within six years of the wrongful act and for the reasons already discussed, the two-year discovery rule (see CPLR PLR 213 [8]; CPLR 203 [g] [1]) does not render the claim timely.
Thus, plaintiffs' ninth cause of action for unjust enrichment is dismissed.
Third and Fourth Causes of Action - Fraud and Civil Conspiracy
In their third and fourth causes of action, which are asserted against the CCTV defendants and Good, plaintiffs set forth a fraud and civil conspiracy claim in connection with plaintiffs' investment in TVCC. These causes of action insofar as asserted against the CCTV defendants will be addressed below in the context of the CCTV defendants' motion to dismiss. 
Regarding Good, these claims allege that Good represented to plaintiffs that TVCC's spectrum could be used to enhance Sky Terra's planned network and to augment its spectrum, all the while knowing that Sky Terra's spectrum was not suitable for its planned terrestrial use. As a result of Good concealing this information from plaintiffs, plaintiffs purchased a substantial portion of TVCC in 2008 for approximately $150 million, and ultimately merged it into Sky Terra. Plaintiffs allege that, had they known of the defect in Sky Terra's proposed network, they would not have invested in TVCC. 
These causes of action are untimely for the same reasons discussed above — that is, plaintiffs could have, with reasonable diligence, discovered Good's alleged knowledge of the defects associated with Sky Terra's proposed ATC network well before the beginning of the controlling two-year period. 
Thus, the third and fourth causes of action are also dismissed insofar as asserted against Good. In light of the foregoing, the Apollo defendants' motion to dismiss the complaint insofar as asserted against them as time-barred is granted in its entirety and any contentions not addressed by the court with respect to this motion sequence are either moot or without merit. 

 The Apollo Defendants' Motion to Dismiss the Complaint 
 Pursuant to CPLR 3211 (a) (1), (5) and (7)
In motion sequence number 003, the Apollo defendants move, in the alternative, to dismiss the complaint insofar as asserted against them pursuant to CPLR 3211 (a) (1), (5) and (7), arguing that in the event the court does not dismiss the claims against them as time-barred, it should do so on the alternative basis that, inter alia, plaintiffs fail to plead a legally sufficient cause of action against them. Considering the court's determination to grant the Apollo defendants' motion to dismiss to dismiss the complaint insofar as asserted against them as time-barred, their motion to dismiss the complaint on alternative bases is denied as moot.

The CCTV Defendants' Motion to Dismiss the Complaint 
 Pursuant to CPLR 3211 (a)(5), (7) and (8)
In motion sequence number 004, the CCTV defendants move, in effect, pursuant to CPLR 3211 (a) (5), (7) and (8), to dismiss the complaint insofar as asserted against them. Only the third, fourth, and tenth causes of action are asserted against the CCTV defendants. 
[*8]Third Cause of Action — Fraud
In the third cause of action, plaintiffs allege that Singh knew that plaintiffs were acquiring an interest in TVCC in order to use TVCC's spectrum to augment Sky Terra's spectrum and to enhance Sky Terra's planned network. Plaintiffs allege that during negotiations regarding plaintiffs' purchase of TVCC, Singh intentionally failed to disclose the OOBR interference problem, knowing that it would render Sky Terra's planned network unworkable. Had plaintiffs known about the defect in Sky Terra's planned network, the complaint alleges, they would not have purchased an interest in TVCC.
In moving to dismiss this cause of action, the CCTV defendants point out that the TVCC sale occurred in 2008, more than six years before this action was commenced against them on June 8, 2020. They also contend that plaintiffs were on inquiry notice of their fraud claim more than two years before that date. They point out, among other things, that in January 2018, plaintiffs emailed a draft tolling agreement to Singh and CCTV which stated that plaintiffs "believe that they may hold claims against CCTV and Singh for, among other things, fraud, civil conspiracy, and unjust enrichment in connection with the [plaintiffs'] purchase of [TVCC] from Singh and his company CCTV" (NYSCEF Doc. No. 103). Singh and CCTV did not sign the tolling agreement, and it was not until June 8, 2020 that plaintiffs filed these fraud, civil conspiracy, and unjust enrichment claims against them. 
The court agrees that the draft tolling agreement establishes that, by January of 2018, plaintiffs were at least aware of the probability that they had been defrauded by the CCTV defendants. Therefore, in January 2018, at the latest, a duty of inquiry arose. Plaintiffs fail to allege that they engaged in the exercise of reasonable diligence at that time. As such, knowledge of the fraud is imputed (see Aozora Bank, Ltd. v Deutsche Bank Sec. Inc., 137 AD3d at 690; CIFG Assur. N. Am., Inc. v Credit Suisse Sec. (USA) LLC, 128 AD3d at 608). Plaintiffs assert that an examination of Sky Terra's books and records in the fall of 2018 revealed the existence of an email that corroborated plaintiffs' belief that they had been defrauded by Singh. They assert that it was not until this discovery that they were certain they had a case against him. However, the same investigation could have been performed in January 2018, when the obligation to investigate arose. Since plaintiffs did not bring their fraud claim against the CCTV defendants until June 8, 2020, more than two years later, the claim is time barred.[FN2]

Thus, the third cause of action is dismissed insofar as asserted against the CCTV defendants.
Fourth Cause of Action — Civil Conspiracy
Given that plaintiffs' fraud claim, insofar as asserted against the CCTV defendants, is time barred, their claim for conspiracy to commit fraud also fails (see Boesky v Levine, 193 AD3d at 406; EVEMeta, LLC v Siemens Convergence Creators Corp., 173 AD3d at 553). Thus, plaintiffs' second cause of action is dismissed.
Tenth Cause of Action — Unjust Enrichment
Plaintiffs allege that the CCTV defendants were unjustly enriched by plaintiffs when plaintiffs acquired their interest in TVCC. This claim is governed by a six-year statute of limitations (see Sabourin v Chodos, 194 AD3d at 662; CPLR 213 [8]) and accrued "upon the occurrence of the alleged wrongful act giving rise to restitution" (Kaufman v Cohen, 307 AD2d at 127; see Swain v Brown, 135 AD3d at 632)  that is at the latest in 2008 when plaintiffs purchased the CCTV defendants' interest in TVCC. Plaintiffs failed to commence this action within six years of the purchase and, for the reasons already noted, the two-year discovery rule does not render the claim timely. Thus, plaintiffs' ninth cause of action for unjust enrichment is dismissed.
In light of the foregoing, the CCTV defendants' motion to dismiss the complaint insofar as asserted against them is granted on statute of limitations grounds, and any contentions not addressed by the court with respect to this motion sequence are either moot or without merit. 

 Conclusion
For the foregoing reasons, it is hereby
ORDERED that the motion by defendants Apollo Global Management, Inc. f/k/a Apollo Global Management, LLC, Apollo Investment Fund IV, L.P., Apollo Overseas Partners IV, L.P., AIF IV/RRRR LLC, AP/RM Acquisition LLC, ST/RRRR LLC, Andrew Africk, Marc Rowan, Michael Gross, Michael D. Weiner, Aaron J. Stone, Jeffrey A. Leddy, and Alexander Good, to dismiss the complaint, pursuant to CPLR 3211 (a)(1) and (a)(5), is granted and the complaint is dismissed insofar as asserted against those defendants (Motion Sequence No. 002); and it is further
ORDERED that the motion, in the alternative, by defendants Apollo Global Management, Inc. f/k/a Apollo Global Management, LLC, Apollo Investment Fund IV, L.P., Apollo Overseas Partners IV, L.P., AIF IV/RRRR LLC, AP/RM Acquisition LLC, ST/RRRR LLC, Andrew Africk, Marc Rowan, Michael Gross, Michael D. Weiner, Aaron J. Stone, Jeffrey A. Leddy, and Alexander Good, to dismiss the complaint, pursuant to CPLR 3211 (a)(1), (5) and (7), is denied as moot (Motion Sequence No. 003) ; and it is further
ORDERED that the motion by defendants CCTV One Four Holdings, LLC and Rajendra Singh to dismiss the complaint insofar as asserted against them, in effect, pursuant to CPLR 3211 (a)(5), (a)(7) and (a) (8), is granted and the complaint is dismissed insofar as asserted against them (Motion Sequence No. 004); and it is further
ORDERED that the Clerk of the court shall enter judgment accordingly.
This constitutes the decision, order, and judgment of the Court.
DATE 5/23/23
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1: In 2013, some of the plaintiffs in the instant action also sued members of the GPS industry in the Southern District of New York for, inter alia, fraudulently concealing the OOBR interference issue. On February 15, 2015, the District Court dismissed their complaint in that action (see LightSquared Inc. v Deere & Co., No. 13-CV-5543 RMB, 2015 US Dist LEXIS 14412, 2015 WL 585655 [SD NY 2015], affd sub nom Harbinger Cap. Partners LLC v Deere & Co., 632 F Appx 653 [2d Cir 2015]).

Footnote 2: Former Governor Andrew Cuomo's Executive Order No. 202.8, issued on March 20, 2020 in response to the Covid-19 pandemic, tolled any "specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, . . . until April 19, 2020" (Executive Order No. 202.8 [9 NYCRR ' 8.202.8]). The toll was subsequently extended nine times, extending the deadline through November 3, 2020 (see Executive Order Nos. 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67 and 202.72 [9 NYCRR §§ 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, and 8.202.72]). Such tolls are inconsequential here because plaintiffs' claim had already expired by March 20, 2020, when the Governor's tolling order first went into effect.